**FILED**
US DISTRICT COURT
WESTERN DISTRICT
OF ARKANSAS

Nov 30, 2022

OFFICE OF THE CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF ARKANSAS
## FORT SMITH, ARKANSAS

ALANA S. PHILLIPS                  §
                                   §
Plaintiff(s)                       §
        *v.*                       §        Civil Action No.  2:22-cv-2181-PKH
                                   §
                                   §
Mena Regional Health System        §
Hospital Commission Members:       §
DR. CARLOS ROCHA, MICHAEL          §
MYERS, LEON PHILPOT,               §
PAULA BROTHERTON, JOHN             §
MADDOX, PHILLIP HENSLEY,           §
and DAVID GILBERT,                 §
                                   §
Defendant(s)

## PLAINTIFF's ORIGINAL COMPLAINT & APPLICATION FOR INJUNCTIVE RELIEF

### A. PRELIMINARY STATEMENT

1. The *21st Century Cures Act* (42 USC 201) was passed into law on December 13, 2016.

2. The Cures Act removed the rights from U.S. Citizens to provide informed consent before participating in clinical research for devices (21 U.S.C. 360j(g)(3)), as well as drugs (21 U.S.C. 355(i)(4)).

3.   If the Secretary of Health and Human Services prescribes, informed consent does not need obtained when "the proposed clinical testing poses no more than minimal risk to the human subject."[1]

4.   The relevant change in the Cures Act is:

SEC. 3024. INFORMED CONSENT **WAIVER** OR ALTERATION FOR CLINICAL INVESTIGATIONS.

(a) **DEVICES**.—Section 520(g)(3) of the Federal Food, Drug, and Cosmetic Act **(21 U.S.C. 360j(g)(3))** is amended—

(1) in subparagraph (D), **by striking** ''except where subject to such conditions as the Secretary may prescribe, the investigator'' **and inserting** the following: ''**except where, subject to such conditions as the Secretary may prescribe—**

''**(i) the proposed clinical testing poses no more than minimal risk to the human subject and includes appropriate safeguards to protect the rights, safety, and welfare of the human subject;**''[2] (Emphasis added)

5.   Now 21 USC § 360j(g)(3)(D), under "General provisions respecting control of devices intended for human use", states "assure that **informed consent will be obtained from each human subject** (or his representative) of proposed clinical testing involving such **device, except where**, subject to such conditions **as the Secretary may prescribe—**

---

[1] https://www.govinfo.gov/content/pkg/USCODE-2010-title21/html/USCODE-2010-title21-chap9-subchapV-partA-sec360j.htm (last viewed October 4, 2022)
[2] https://www.congress.gov/114/plaws/publ255/PLAW-114publ255.pdf (last viewed October 4, 2022.)

2

(i) the proposed clinical testing poses no more than minimal risk to the human subject and includes appropriate safeguards to **protect the rights, safety, and welfare of the human subject**;"[1] (Emphasis added)

6. Minimal risk, per 45 CFR 46.102(j), "means that the probability and magnitude of harm or discomfort anticipated in the research are not greater in and of themselves than those ordinarily encountered in daily life or during the performance of routine physical or psychological examinations or tests."

7. This law allows the subjective interpretation of "minimal risk" to be used upon an entire country, forcing participation in one or more research studies.

8. There is a conflict between the Cures Act and the FD&C Act; Title 21 U.S.C. § 360bbb-3(e)(1)(A)(ii)(I-III) of the Federal Food, Drug, and Cosmetic Act (FD&C Act) states: "individuals to whom the product is administered are informed—

(I) that the Secretary has authorized the emergency use of the product;

(II) of the significant known and potential benefits and risks of such use, and of the extent to which such benefits and risks are unknown; and

(III) of the option to accept or refuse administration of the product, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks."

9. Definitions under Title 21 U.S.C. §360bbb-3(a)(4)(C) include "The term 'product' means a drug, **device**, or biological product."

10. Plaintiff seeks a declaration and injunction against **§** 3024 of the 21st Century Cures Act (21 U.S.C. 360j(g)(3) and 21 U.S.C. 355(i)(4)) because it allows her to be forced to

be a human subject, as well as her family members who are considered a special population or may be in the future.

## B. PARTIES

11. Plaintiff, Alana S. Phillips, is an individual who is a resident of Polk County, Arkansas (see Declaration, Exhibit A.)

12. Defendants represent the Mena Regional Health System Hospital Commission. DR. CARLOS ROCHA (term expires 8/31/2026), MICHAEL MYERS (term expires 8/31/2025), LEON PHILPOT (term expires 8/31/2023), PAULA BROTHERTON (term expires 8/31/2023), JOHN MADDOX (term expires 8/31/2027),  PHILLIP HENSLEY term expires 8/31/2027), and DAVID GILBERT (term expires 8/31/2024). Per the city website, terms are for five years; expiration of the current term follows Defendants' names.[3]

## C. JURISDICTION

This action arises under the Constitution of the United States and the laws of the United States, including 42 U.S.C. § 1983. Thus, this Court has jurisdiction, pursuant to 28 U.S.C. § 1331, because it arises under federal law, and pursuant to 28 U.S.C. § 1343, because this action seeks to redress the deprivation of rights, privileges, and immunities secured by the Constitution of the United States.

Plaintiffs' action for declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201 and 2202 and by Rules 57 and 65 of the Federal Rules of Civil Procedure.

---

[3] https://cityofmena.org/committeescommissions/  (last viewed on November 28, 2022).

## D. VENUE

13. Venue is proper in this district under 28 U.S.C § 1391 because the events giving rise to this claim occurred in this district, Plaintiff resides in and, on information and belief, Defendants reside in this district.

## E. CONDITIONS PRECEDENT

14.  All conditions precedent have been performed or have occurred.

## F. FACTS AND ALLEGATIONS

### FACTS RELATED TO THE PLAINTIFF

15. Plaintiff and her husband moved to Mena, Arkansas, in April of 2022 because their daughter and family moved to the area in late 2021.

16. Plaintiff's third grandson was due to be born in early September.

17. Plaintiff's daughter had been seeing a mid-wife in DeQueen, Arkansas, and was set for a home birth.

18. On the morning of Sep 8th, 2022, Plaintiff received a text from her daughter saying she had instead gone to the hospital overnight, the baby had been born, and she asked Plaintiff to come there to help her with the baby.

### FACTS RELATED TO THE DEFENDANTS

19. The Mena Hospital Commission is made up of members appointed by the Mayor and approved by the City Council[4]. Members listed on the hospital website[5] do not match members listed on the city website[6], as of November 28, 2022.

## FACTS RELATED TO THE COUNTS

20. When Plaintiff arrived at the Mena Regional Health Center soon after 7:30 am, she discovered a sign on the entrance door saying masks are required.

21. Plaintiff told the lady at the front desk she did not have to wear a mask because this was a free country and she had rights.

22. Plaintiff also told the lady not to take her temperature.

23. This lady called her supervisor.

24. Plaintiff believes the lady did take her temperature without permission.

25. Plaintiff observed the lady writing down information on a sheet of paper as each person walked by to proceed past the front desk and down the hall.

26. It appeared each person walking by got their temperature taken by a device set up next to the desk.

27. One person came in a different door and came up the hall to the desk, apparently just to have a temperature taken and recorded.

28. The supervisor told me she did not agree with the face masks either, but she said she had no choice.

29. Plaintiff told her she understood she had to wear a mask to keep her job.

_____

[4] https://mypulsenews.com/baptist-health-presents-acquisition-proposal-to-mena-hospital-commission/ (last viewed on September 18, 2022.)

[5] https://menaregional.com/about-us/commission-members/ (last viewed on September 18, 2022.)

[6] https://cityofmena.org/committeescommissions/ (last viewed on September 18, 2022.)

30. Plaintiff told her she did not have to wear a mask because she works for God.

31. The supervisor said she needed to contact someone else to talk to Plaintiff.

32. Next a young man named Chandler appeared and talked to Plaintiff about the mask requirement.

33. He then went away for a few minutes.

34. A visitor showed up who was going to the same room as Plaintiff.

35. When she heard the room number the visitor was going to, Plaintiff started walking down the hall, looking for room numbers.

36. Chandler then started following Plaintiff, but at a distance.

37. When Plaintiff arrived at the nursery area, Chandler kept it locked so neither Plaintiff or the other visitor could enter.

38. With the other visitor also locked out, Plaintiff decided it was better to leave rather then keep the visitor out.

39. Upon arriving back at the entrance, Plaintiff observed one or two police officers, as called by the hospital staff.

40. Plaintiff continued to proceed towards the front door to exit.

41. Chandler told Plaintiff she did not have to wear a mask while she was in her daughter's hospital room, but just in the hall (the same hall Plaintiff had just traversed twice without wearing a mask).

42. Plaintiff informed Chandler that she does not obey illegal orders, and she left the building.

43. One police officer talked to Plaintiff for a minute or two outside the building, then told the other police officer that Plaintiff was leaving.

44. Plaintiff was not able to see her newborn grandson that day due to the unconstitutional and illegal mask mandate at the hospital and her unwillingness to follow the mandate.

45. Plaintiff and her family live in Polk County and plan to continue residing in Polk County.

46. Allowing the unconstitutional and illegal mandate to continue puts her at risk of not seeing other family members or friends who might be in the hospital or a clinic, or of receiving emergency treatment there.

47. Plaintiff's daughter had to find another contact for her children (Plaintiff's grandchildren) in case of a medical emergency.

## HISTORICAL FACTS  BEARING ON THE COMPLAINT

48. In 2003, the Centers for Disease Control (CDC) filed a series of patents related to a coronovirus.

49. According to the Cornell Law School Legal Information Institution,  "A patent grants the patent holder the exclusive right to exclude others from making, using, importing, and selling the patented innovation for a limited period of time."[7]

50. One patent, 7,776,521, dated August 17, 2010, states under Background, "10/822,904, filed Apr. 12, 2004, and issued as U.S. Pat. No. 7,220,852 on May 22, 2007, which in turn claims the benefit of U.S. Provisional Patent Application No. 60/465,927 filed Apr. 25, 2003"[8].

---

[7] https://www.law.cornell.edu/wex/patent (last viewed on September 28, 2022)
[8] https://patents.justia.com/patent/7220852 (last viewed on September 28, 2022)

51. Patent No. 7,776,521 further states "This invention relates to a newly isolated human coronavirus. More particularly, it relates to an isolated coronavirus genome, isolated coronavirus proteins, and isolated nucleic acid molecules encoding the same. The disclosure further relates to methods of detecting a severe acute respiratory syndrome-associated coronavirus and compositions comprising immunogenic coronavirus compounds."*Id.*

52. The above patent application was filed by "The United States of America as represented by the Secretary of the Department of Health and Human Services, Centers for Disease Control and Prevention" on May 14, 2007. *Id.*

53. The Supreme Court on patents: "For the reasons that follow, we hold that a **naturally occurring** DNA segment is a product of nature and not patent eligible merely because it has been isolated, but that cDNA is patent eligible because it is **not naturally occurring**." (Ass'n for Molecular Pathology v. Myriad Genetics, Inc., 133 S. Ct. 2107, 186 L.Ed.2d 124, 81 USLW 4388 (2013)).

54. In February 2016, a Rapid Medical Countermeasure Response to Infectious Diseases workshop was held in Washington, D.C., with the support of the National Academy of Sciences and the American College of Emergency Physicians; American Hospital Association; Centers for Disease Control and Prevention; Department of Health and Human Services' Administration for Children and Families; Department of Health and Human Services' National Institutes of Health: National Institute of Allergy and Infectious Diseases, National Institute of Environmental Sciences, National Library of Medicine; Department of Health and Human Services' Office of the Assistant Secretary for Preparedness and Response; Food and Drug Administration; National Association of

County and City Health Officials; and National Association of Emergency Medical Technicians; as well as other public and private entities.[9]

55. Peter Daszak, president of EcoHealth Alliance, attended and spoke about the EcoHealth Alliance coronovirus research funded by Fogarty International Center at NIH, U.S. Agency for International Development (USAID), and the National Institute of Allergy and Infectious Diseases (NIAID). *Id.*

56. The workshop summary publication includes that "Daszak reiterated that, until an infectious disease crisis is very real, present, and at an emergency threshold, it is often largely ignored. To sustain the funding base beyond the crisis, he said, we need to increase public understanding of the need for [Medical Countermeasures] MCMs such as a pan-influenza or pan-coronavirus vaccine. A key driver is the media, and the economics follow the hype. We need to use that hype to our advantage to get to the real issues. Investors will respond if they see profit at the end of process, Daszak stated." *Id.*

57. Emails obtained from HHS indicate a NIAID Grant collaboration between EcoHealth Alliance and Wuhan Institute of Virology, CAS.[10]

58. The NIH grant database (Research Portfolio Online Reporting Tools, or RePORT), documents NIAD grants from 2014 - 2019 to EcoHealth Alliance totaling $ 3,748,715. [11]

59. The title of the project is "Understanding the Risk of Bat Coronavirus Emergence". *Id.*

60. The Program Director/Principal Investigator is listed as Peter Daszak. *Id.*

---

[9] Forum on Medical and Public Health Preparedness for Catastrophic Events; Forum on Drug Discovery, Development, and Translation; Forum on Microbial Threats; Board on Health Sciences Policy; Board on Global Health; Institute of Medicine; National Academies of Sciences, Engineering, and Medicine. Rapid Medical Countermeasure Response to Infectious Diseases: Enabling Sustainable Capabilities Through Ongoing Public- and Private-Sector Partnerships: Workshop Summary. Washington (DC): National Academies Press (US); 2016 Feb 12. 6, Developing MCMs for Coronaviruses. Available from: https://www.ncbi.nlm.nih.gov/books/NBK349040/

[10] https://www.judicialwatch.org/documents/jw-v-hhs-nih-wuhan-inst-august-2021-00696/  (last viewed October 6, 2022.

[11] https://reporter.nih.gov/project-details/9819304 (last viewed October 6, 2022).

61. Aim 2 of the above study is "Community, and clinic-based syndromic, surveillance to capture SARSr-CoV spillover, routes of exposure and potential public health consequences. We will conduct biological-behavioral surveillance in high-risk populations, with known bat contact, **in community and clinical settings** to 1) identify risk factors for serological and PCR evidence of bat SARSr-CoVs; & 2) **assess possible health effects of SARSr-CoVs infection in people**. We will analyze bat-CoV serology against human-wildlife contact and exposure data to quantify risk factors and health impacts of SARSr-CoV spillover." *Id.* (Emphasis added)

62. The project abstract concludes with "We will combine these data with bat host distribution, viral diversity and phylogeny, **human survey of risk behaviors and illness**, and serology to identify SARSr-CoV spillover risk hotspots across southern China. Together these data and analyses will be critical for the future development of public health interventions and enhanced surveillance to prevent the re-emergence of SARS or the emergence of a novel SARSr-CoV." *Id.* (Emphasis added).

**NATIONAL EMERGENCY**

63. The Secretary of Health and Human Services declared a nationwide public health emergency on January 31, 2020.[12]

64. The United States President declared a National Emergency on March 13, 2020, via Proclamation 9994.[13]

---

[12] https://aspr.hhs.gov/legal/PHE/Pages/2019-nCoV.aspx  (last viewed on September 28, 2022)
[13] https://www.federalregister.gov/documents/2020/03/18/2020-05794/declaring-a-national-emergency-concerning-the-novel-coronavirus-disease-covid-19-outbreak (last viewed on September 28, 2022)

65. The Secretary of Health and Human Services issued a "Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19" on March 17, 2020, deemed effective February 4, 2020. [14]

66. The Declaration is "pursuant to section 319F-3 of the Public Health Service Act to provide liability immunity for activities related to medical countermeasures against COVID-19." *Id.*

67. The declaration gives "liability immunity to certain individuals and entities (Covered Persons) against any claim of loss caused by, arising out of, relating to, or resulting from the manufacture, distribution, administration, or use of medical countermeasures (Covered Countermeasures), except for claims involving "willful misconduct" as defined in the PREP Act." *Id.*

68. Per the above declaration, the Pandemic and All-Hazards Preparedness Reauthorization Act (PAHPRA), Public Law 113-5, "also extended the definition of qualified pandemic and epidemic products that may be covered under a PREP Act Declaration to include products or technologies intended to enhance the use or effect of a drug, biological product, or device used against the pandemic or epidemic or against adverse events from these products." *Id.*

## EMERGENCY USE AUTHORIZATION

69. The FDA issued an Emergency Use Authorization (EUA) for face masks for the general public on April 18, 2020. [15]

70. This letter was replaced on April 24, 2022, with a new letter. *Id.*

---

[14] https://www.federalregister.gov/documents/2020/03/17/2020-05484/declaration-under-the-public-readiness-and-emergency-preparedness-act-for-medical-countermeasures (last viewed on September 28, 2022)

[15] https://www.fda.gov/media/137121/download (Last viewed September 28, 2022)

12

71. In its umbrella Emergency Use Authorization ("EUA") for face masks to be used by the general public in response to COVID-19, the FDA recites that "the authorized face masks **may** be effective as source control to help prevent the spread of" COVID-19. *Id.* (emphasis added).

72. The April 24, 2022, letter starts with "On April 18, 2020, **in response to concerns relating to insufficient supply and availability of face masks**, the U.S. Food and Drug Administration (FDA) issued an Emergency Use Authorization (EUA) authorizing the use of face masks for use by members of the general public, including health care personnel (HCP) in healthcare settings as personal protective equipment (PPE), to cover their noses and mouths, in accordance with **Centers for Disease Control and Prevention (CDC) recommendations**, to prevent the spread of the virus called severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) during the Coronavirus Disease 2019 (COVID-19) pandemic, pursuant to section 564 of the Federal, Food, Drug, and Cosmetic Act (the Act) (21 U.S.C. 360bbb-3)."(Emphasis added). *Id.*

73. In 2010, the CDC had recommended "that persons with influenza wear surgical masks when in contact with susceptible individuals."[16]

74. Footnote 1 from sentence 76 above explains: "A face mask is a device, with or without a face shield, that covers the user's nose and mouth and **may or may not meet fluid barrier or filtration efficiency levels**. **It includes cloth face coverings as a subset.** It may be for single or multiple uses, and if for multiple uses it may be laundered or cleaned. There are many products marketed in the United States as "face masks" that offer a range of protection against potential health hazards. Face masks are regulated by

---

[16] Milton, D. K., Fabian, M. P., Cowling, B. J., Grantham, M. L., & McDevitt, J. J. (2013). Influenza virus aerosols in human exhaled breath: particle size, culturability, and effect of surgical masks. *PLoS pathogens, 9*(3), e1003205.

13

FDA when they meet the definition of a "device" under section 201(h) of the Act. **Generally, face masks fall within this definition when they are intended for a medical purpose**. Face masks are regulated under 21 CFR 878.4040 as Class I 510(k)-exempt devices (non-surgical masks)." (Emphasis added.) *Id.*

75. Per 21 CFR 878.4040, as shown in the preceding numbered sentences, "Class I (general controls) for surgical apparel other than surgical gowns and surgical masks. The class I device is exempt from the premarket notification procedures in subpart E of part 807 of this chapter subject to § 878.9."[17]

76. In contrast, "Class II (special controls) for surgical gowns and surgical masks. A surgical N95 respirator or N95 filtering facepiece respirator is not exempt if it is intended to prevent specific diseases or infections, or it is labeled or otherwise represented as filtering surgical smoke or plumes, **filtering specific amounts of viruses** or bacteria, reducing the amount of and/or killing viruses, bacteria, or fungi, or affecting allergenicity, or it contains coating technologies unrelated to filtration (e.g., to reduce and or kill microorganisms)." (Emphasis added). *Id.*

77. Footnote 6 in the EUA letter explains the reason for republishing the EUA as, "The amendments to the April 18, 2020 letter clarify that the eligible facemasks are to be used for source control only, and are not personal protective equipment, meaning they are not a substitute for filtering face piece respirators or for surgical face masks. This reissued EUA does not change any aspects of the April 18, 2020 letter with respect to the use of face masks by the general public." *Id.*

---

[17] https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfcfr/CFRSearch.cfm?FR=878.4040  (last viewed on September 29, 2022).

78. Footnote 7 then states that, "Source control refers to the use of a facemask or cloth face covering over the mouth and nose to contain that individual's respiratory secretions to help prevent transmission from infected individuals who may or may not have symptoms of COVID-19." *Id.*

79. S*ource control* can generally be defined as "all physical measures to eliminate sources of infection, to control contamination, and to restore anatomy and function."[18]

80. The Federal Food and Drug Administration's position on the efficacy of masks in preventing the spread of COVID-19 for people of all ages has been open to interpretation. On the FDA's website regarding face masks, surgical masks, and respirators, it states that "[m]asks **may** help prevent people who have COVID-19 from spreading the virus to others. . . . Wearing a face mask **may** limit exposure to respiratory droplets and large particles and **may** help prevent people who have COVID-19 from spreading the virus."[19] (Emphasis added).

81. In research, this is the same as saying **the results are not statistically significant**: a treatment may work, or it may not work. The researcher may not conclude the results obtained are "meaningful and legitimate"[20].

82. Then the FDA prohibited manufacturers of non-surgical masks from labeling their product: "in such a manner that would misrepresent the product's intended use; for example, the labeling **must not state** or imply that the product is intended for

---

[18] Martínez, M. L., Ferrer, R., Torrents, E., Guillamat-Prats, R., Gomà, G., Suárez, D., ... & Artigas, A. (2017). Impact of source control in patients with severe sepsis and septic shock. *Critical Care Medicine, 45*(1), 11-19.

[19] https://www.fda.gov/medical-devices/coronavirus-covid-19-and-medical-devices/face-masks-barrier-face-coverings-surgical-masks-and-respirators-covid-19#:%7E:text=Source%20control%20refers%20to%20use,spread%20of%20respiratory%20secretions (last viewed October 14, 2022.)

[20] https://dictionary.apa.org/not-significant (last viewed October 14, 2022).

antimicrobial or **antiviral protection** or related uses or is for use such as infection prevention or reduction." [21]

83. Thus, the FDA – the very agency charged with researching and understanding the efficacy of **medical devices** – has not been able to state whether the kinds of face masks being used by the general public provide any benefit for preventing the spread of a virus such as COVID-19, beyond labeling the box of surgical masks.

84.   In December 2020, the World Health Organization (WHO) announced:

> At present, there is only limited and inconsistent scientific evidence to support the effectiveness of masking of healthy people in the community to prevent infection with respiratory viruses, including SARS-CoV-2. A large randomized community-based trial in which 4862 healthy participants were divided into a group wearing medical/surgical masks and a control group found no difference in infection with SARS-CoV-2.[22]

85.   The WHO still recommended "Although more research on universal masking in heath settings is needed, it is the expert opinion of the majority (79%) of WHO COVID-19 IPC GDG members that universal masking is advisable in geographic settings where there is known or suspected community or cluster transmission of the SARS-CoV-2 virus. *Id*.

## EMERGENCY FUNDING

---

[21] https://www.fda.gov/media/137121/download (Last viewed September 28, 2022)
[22] World Health Organization, Mask use in the context of COVID-19. Geneva, Switzerland, 1 December, 2020, available at https://www.who.int/publications/i/item/advice-on-the-use-of-masks-in-the-community-during-home-care-and-in-healthcare-settings-in-the-context-of-the-novel-coronavirus-(2019-ncov)-outbreak (last viewed on September 19, 2022.)

86. The Paycheck Protection Program (PPP), part of the Cares Act[23] signed into law on March 27, 2020, was for "providing small businesses with the resources they need to maintain their payroll, hire back employees who may have been laid off, and cover applicable overhead.[24]"

87. The **Mena Hospital Commission** received a PPP loan of $2,644,059 on April 27, 2020, for payroll proceeds; $2,673,805 was forgiven (includes accrued interest) on June 9, 2021[25] [26].

88. The **Mena Hospital Commission** Received $100,000 through the Rural Health Clinic (RHC) Testing & Mitigation Program, which is part of the American Rescue Plan Act of 2021. [27]

89. Some hospitals received payments from the Provider Relief Fund in phases, as "Two weeks after enactment of the CARES Act, on April 10, 2020, HHS distributed $30 billion to eligible Medicare providers."[28]

90. A CDC website explains "HHS is providing support to healthcare providers fighting the coronavirus disease 2019 (COVID-19) pandemic through the bipartisan Coronavirus Aid, Relief, & Economic Security (CARES) Act; the Paycheck Protection Program and Health Care Enhancement Act (PPPHCEA); and the Coronavirus Response and Relief Supplemental Appropriations (CRRSA) Act, which provide a total of $178 billion for relief funds to hospitals and other healthcare providers on the front lines of the COVID-19 response. This funding supports healthcare-related expenses or lost revenue

---

[23] https://www.congress.gov/bill/116th-congress/house-bill/748/text (last viewed September 30, 2022).

[24] https://home.treasury.gov/policy-issues/coronavirus/assistance-for-small-businesses (last viewed September 30, 2022).

[25] https://projects.propublica.org/coronavirus/bailouts/loans/mena-hospital-commission-5240977201 (last viewed September 30, 2022)

[26] Dataset available at https://data.sba.gov/dataset/8aa276c2-6cab-4f86-aca4-a7dde42adf24/resource/aa442c64-ba87-4193-9b14-552a99bc78a5/download/public_150k_plus_220703.csv (last viewed September 30, 2022)

[27] https://taggs.hhs.gov/Coronavirus/RuralHealthClinics (last viewed September 30, 2022)

[28] https://www.hrsa.gov/provider-relief/data/general-distribution (last viewed September 30, 2022.)

attributable to COVID-19 and ensures uninsured Americans can get treatment for COVID-19. HHS is distributing this Provider Relief Fund (PRF) money and these payments do not need to be repaid." [29]

91. The **Mena Hospital Commission** received $4,649,042 through the Provider Relief Fund, per the CDC website. *Id.*

92. Another source presenting data reported to be obtained from the U.S. Health Resources & Services Administration shows the **Mena Hospital Commission** received $10,346,728 through the Provider Relief Fund.[30]

## PROTECTION OF HUMAN SUBJECTS

93. NIH Research grants require IRB approval. [31]

94. NIH funded research falls under 45 CFR § 46 (Protection of Human Subjects). *Id.*

95. The FDA also regulates human subject protections through 21 CFR § 50 (Protection of Human Subjects).

96. The NIH regulation (45 CFR § 46) includes additional protections for pregnant women, fetuses, neonates, and prisoners, while FDA's regulation (21 CFR § 50) does not.[32]

97. The FDA's and NIH's Human Subject Protections regulations both include additional safeguards for children. [33, 34]

---

[29] https://data.cdc.gov/Administrative/HHS-Provider-Relief-Fund/kh8y-3cs6 (last viewed September 30, 2022)
[30] https://www.statnews.com/2021/09/24/covid-19-relief-money-providers-in-your-state/ (last viewed October 3, 2022).
[31] https://www.niaid.nih.gov/research/human-subjects-certifications-irb-or-icc-sop (last viewed October 11, 2022).
[32] https://www.hopkinsmedicine.org/institutional_review_board/guidelines_policies/guidelines/fda_ohrp.html (last visited October 11, 2022).
[33] https://www.ecfr.gov/current/title-21/part-50/subpart-D (last viewed October 11, 2022).
[34] https://www.ecfr.gov/on/2018-07-19/title-45/subtitle-A/subchapter-A/part-46#subpart-D (last viewed October 11, 2022).

98. The 2016 Cures Act appears to counter the currently published **21 CFR § 50.24, which regulates** informed consent during an emergency[35].

99. The FDA's regulation, 21 CFR § 50.24, titled "Exception from informed consent requirements for emergency research" states when informed consent is not required:

 (a) The IRB responsible for the review, approval, and continuing review of the clinical investigation described in this section may approve that investigation without requiring that informed consent of all research subjects be obtained if the IRB (with the concurrence of a licensed physician who is a member of or consultant to the IRB and who is not otherwise participating in the clinical investigation) finds and documents **each of the following**: (Emphasis added).

   (1) The human subjects are in a life-threatening situation, available treatments are unproven or unsatisfactory, **and the collection of valid scientific evidence**, which may include evidence obtained through randomized placebo-controlled investigations, is necessary to determine the safety and effectiveness of particular interventions.

   (2) **Obtaining informed consent is not feasible** because:

      (i) The subjects will not be able to give their informed consent as a result of their medical condition;

      (ii) The intervention under investigation must be administered before consent from the subjects' legally authorized representatives is feasible; and

      (iii) There is no reasonable way to identify prospectively the individuals likely to become eligible for participation in the clinical investigation.

   (3) Participation in the research holds out the prospect of direct benefit to the subjects because:

      (i) Subjects are facing a life-threatening situation that necessitates intervention;

      (ii) Appropriate animal and other preclinical studies have been conducted, and the information derived from those studies and related evidence support the potential for the intervention to provide a direct benefit to the individual subjects; and

      (iii) Risks associated with the investigation are reasonable in relation to what is known about the medical condition of the potential class of subjects, the risks and benefits of standard therapy, if any, and what is known about the risks and benefits of the proposed intervention or activity.

   (4) The **clinical investigation could not practicably be carried out without the waiver**.

---

[35] https://www.ecfr.gov/current/title-21/chapter-I/subchapter-A/part-50  (last viewed October 4, 2022).

(5) The proposed investigational plan defines the length of the potential therapeutic window based on scientific evidence, and the investigator has committed to attempting to contact a legally authorized representative for each subject within that window of time and, if feasible, to asking the legally authorized representative contacted for consent within that window rather than proceeding without consent. The investigator will summarize efforts made to contact legally authorized representatives and make this information available to the IRB at the time of continuing review.

(6) The IRB has reviewed and approved informed consent procedures and an informed consent document consistent with § 50.25. These procedures and the informed consent document are to be used with subjects or their legally authorized representatives in situations where use of such procedures and documents is feasible. The IRB has reviewed and approved procedures and information to be used when providing an opportunity for a family member to object to a subject's participation in the clinical investigation consistent with paragraph (a)(7)(v) of this section.

(7) **Additional protections of the rights and welfare of the subjects will be provided**, including, at least:

(i) **Consultation** (including, where appropriate, consultation carried out by the IRB) **with representatives of the communities** in which the clinical investigation will be conducted and from which the subjects will be drawn;

(ii) **Public disclosure to the communities** in which the clinical investigation will be conducted and from which the subjects will be drawn, prior to initiation of the clinical investigation, of plans for the investigation and its risks and expected benefits;

(iii) Public disclosure of sufficient information following completion of the clinical investigation to apprise the community and researchers of the study, including the demographic characteristics of the research population, and its results;

(iv) Establishment of an independent data monitoring committee to exercise oversight of the clinical investigation; and

(v) If obtaining informed consent is not feasible and a legally authorized representative is not reasonably available, the investigator has committed, if feasible, to attempting to contact within the therapeutic window the subject's family member who is not a legally authorized representative, and asking whether he or she objects to the subject's participation in the clinical investigation. The investigator will summarize efforts made to contact family members and make this information available to the IRB at the time of continuing review.

(b) The IRB is responsible for ensuring that procedures are in place to inform, at the earliest feasible opportunity, each subject, or if the subject remains

incapacitated, a legally authorized representative of the subject, or if such a representative is not reasonably available, a family member, of the subject's inclusion in the clinical investigation, the details of the investigation and other information contained in the informed consent document. The IRB shall also ensure that there is a procedure to inform the subject, or if the subject remains incapacitated, a legally authorized representative of the subject, or if such a representative is not reasonably available, a family member, that he or she may discontinue the subject's participation at any time without penalty or loss of benefits to which the subject is otherwise entitled. If a legally authorized representative or family member is told about the clinical investigation and the subject's condition improves, the subject is also to be informed as soon as feasible. If a subject is entered into a clinical investigation with waived consent and the subject dies before a legally authorized representative or family member can be contacted, information about the clinical investigation is to be provided to the subject's legally authorized representative or family member, if feasible.

(c) The IRB determinations required by paragraph (a) of this section and the documentation required by paragraph (e) of this section are to be retained by the IRB for at least 3 years after completion of the clinical investigation, and the records shall be accessible for inspection and copying by FDA in accordance with § 56.115(b) of this chapter.

(d) Protocols involving an exception to the informed consent requirement under this section must be performed under a separate investigational new drug application (IND) or investigational device exemption (IDE) that clearly identifies such protocols as protocols that may include subjects who are unable to consent. The submission of those protocols in a separate IND/IDE is required even if an IND for the same drug product or an IDE for the same device already exists. Applications for investigations under this section may not be submitted as amendments under §§ 312.30 or 812.35 of this chapter.

(e) If an IRB determines that it cannot approve a clinical investigation because the investigation does not meet the criteria in the exception provided under paragraph (a) of this section or because of other relevant ethical concerns, the IRB must document its findings and provide these findings promptly in writing to the clinical investigator and to the sponsor of the clinical investigation. The sponsor of the clinical investigation must promptly disclose this information to FDA and to the sponsor's clinical investigators who are participating or are asked to participate in this or a substantially equivalent clinical investigation of the sponsor, and to other IRB's that have been, or are, asked to review this or a substantially equivalent investigation by that sponsor." *Id.* (Emphasis added).

21

100.  The FDA published a notice in July 2017 to reflect the Cures Act without obtaining

public comment, stating,

> FDA is issuing this guidance for immediate implementation in accordance
> with 21 CFR 10.115(g)(3) without initially seeking prior comment. The
> Agency has determined that prior public participation is not feasible or
> appropriate because this guidance presents a less burdensome policy that
> is consistent with the public health. Although this guidance document is
> immediately in effect, it remains subject to public comment in accordance
> with the Agency's good guidance practices regulation (21 CFR 10.115). [36]

101.  The FDA notice goes on to explain,

> On December 13, 2016, the 21st Century Cures Act (Cures Act) (Pub. L.
> 114-255) was signed into law. Title III, section 3024 of the Cures Act
> amended sections 520(g)(3) and 505(i)(4) of the Federal Food, Drug, and
> Cosmetic Act (the FD&C Act) to provide authority for FDA to permit an
> exception from informed consent requirements when the proposed clinical
> testing poses no more than minimal risk to the human subject and includes
> appropriate safeguards to protect the rights, safety, and welfare of the
> human subject. This statutory amendment became effective on December
> 13, 2016.
>
> Currently, FDA's regulations governing the protection of human subjects
> (21 CFR parts 50 and 56) allow exception from the general requirements
> for informed consent only in life-threatening situations when certain
> conditions are met (21 CFR 50.23) or when the requirements for
> emergency research are met (21 CFR 50.24), but do not include an
> exception from informed consent for minimal risk clinical investigations.
> In light of the Cures Act amendment to the FD&C Act described
> previously, FDA intends to revise its informed consent regulations to add
> a waiver or alteration for minimal risk clinical investigations, under
> appropriate human subject protection safeguards, to the two existing
> exceptions from informed consent. *Id.*

102.  The Secretary of Health Education, and Welfare (HEW) (the predecessor to HHS)

was at one time advised by the court to treat a medicaid payment research study as other

HHS (HEW) research studies which require IRB review: *Crane v. Mathews,* 417 F. Supp.

532, 539-40 (N.D.Ga. 1976) (imposition of $2 copayment for medical treatment is

---

[36] https://www.fda.gov/regulatory-information/search-fda-guidance-documents/irb-waiver-or-alteration-informed-consent-clinical-investigations-involving-no-more-minimal-risk (last viewed October 20, 2022.)

**irreparable injury** to welfare recipients living at subsistence level);" *Beno v. Shalala*, 30 F.3d 1057, 1064 n.10 (9th Cir. 1994). (Emphasis added).

103.  More recently — "*Irreparable harm*. There can be no question that the challenged restrictions, if enforced, will cause irreparable harm. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns* , 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality opinion). (*Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020))"


## RELEVANT RESEARCH STUDIES

104.  As explained in an article titled "Is a Mask That Covers the Mouth and Nose Free from Undesirable Side Effects in Everyday Use and Free of Potential Hazards?", published April 20, 2021, in the *International Journal of Environmental Research and Public Health* the following negative effects from wearing masks were reported in the literature (meaning these negative effects were reported in other studies)[37]:

---

[37]Kisielinski K, Giboni P, Prescher A, Klosterhalfen B, Graessel D, Funken S, Kempski O, Hirsch O. Is a Mask That Covers the Mouth and Nose Free from Undesirable Side Effects in Everyday Use and Free of Potential Hazards? *International Journal of Environmental Research and Public Health.* 2021; 18(8):4344. https://doi.org/10.3390/ijerph18084344 or available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8072811 (last viewed September 21, 2022).

**Increased risk of adverse effects when using masks:**

| Internal diseases | Psychiatric illness | Neurological Diseases |
|---|---|---|
| COPD | Claustrophobia | Migraines and Headache Sufferers |
| Sleep Apnea Syndrome | Panic Disorder | Patients with intracranial Masses |
| advanced renal Failure | Personality Disorders | Epilepsy |
| Obesity | Dementia | |
| Cardiopulmonary Dysfunction | Schizophrenia | |
| Asthma | helpless Patients | |
| | fixed and sedated Patients | |

| Pediatric Diseases | ENT Diseases | Occupational Health Restrictions |
|---|---|---|
| Asthma | Vocal Cord Disorders | moderate / heavy physical Work |
| Respiratory diseases | Rhinitis and obstructive Diseases | |
| Cardiopulmonary Diseases | | Gynecological restrictions |
| Neuromuscular Diseases | Dermatological Diseases | Pregnant Women |
| Epilepsy | Acne | |
| | Atopic | |

105. Examples of statements made in this research paper include the following: "The overall possible resulting measurable drop in oxygen saturation $O_2$ of the blood on the one hand and the increase in carbon dioxide $CO_2$ on the other contribute to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase, in some cases also to a significant blood pressure increase." *Id.*

106. Irreparable harm is likely caused by mask wearing; irreparable harm is likely not prevented:

> The potential drastic and undesirable effects found in multidisciplinary areas illustrate the general scope of global decisions on masks in general public in the light of combating the pandemic. According to the literature found, there are clear, scientifically recorded adverse effects for the mask wearer, both on a psychological and on a social and physical level.

> Neither higher level institutions such as the WHO or the European Centre for Disease Prevention and Control (ECDC) nor national ones, such as the Centers for Disease Control and Prevention, GA, USA (CDC) or the German RKI, substantiate with sound scientific data a positive effect of masks in the public (in terms of a reduced rate of spread of COVID-19 in the population).

> Contrary to the scientifically established standard of evidence-based medicine, national and international health authorities have issued their theoretical assessments on the masks in public places, even though the compulsory wearing of masks gives a deceptive feeling of safety. *Id.* (citations removed)

24

107.  The researchers conclude by recommending that,

> In addition to protecting the health of their patients, doctors should also base their actions on the guiding principle of the 1948 Geneva Declaration, as revised in 2017. According to this, every doctor vows to put the health and dignity of his patient first and, even under threat, not to use his medical knowledge to violate human rights and civil liberties. Within the framework of these findings, we, therefore, propagate an explicitly medically judicious, legally compliant action in consideration of scientific factual reality against a predominantly assumption-led claim to a general effectiveness of masks, always taking into account possible unwanted individual effects for the patient and mask wearer concerned, entirely in accordance with the principles of evidence-based medicine and the ethical guidelines of a physician. *Id.*

108.  Another research study concluded that healthcare workers who are trained in the use of masks have experienced adverse effects from prolonged mask use during the COVID-19 pandemic:

> Headaches related to prolonged mask use can be attributed to mechanical factors, hypercapnia, and hypoxemia. Tight straps and pressure on superficial facial and cervical nerves are mechanical features causing headaches. Cervical neck strain from donning PPE, sleep deprivation, irregular mealtimes, and emotional stress are other sources of headaches among healthcare professionals during prolonged mask use. Tight fitting masks cause inadequate ventilation and increased levels of carbon dioxide (CO2) known as hypercapnia. As CO2 is a known respiratory stimulant, a buildup of exhaled CO2 between the mask and face will cause increased lung ventilation and respiratory activity. Symptoms of hypoxemia such as chest discomfort and tachypnea are also noted in healthcare professionals with prolonged mask use. Exhaled CO2 builds up between the mask and face, and increased levels of CO2 **cause confusion, impaired cognition, and disorientation**[38]. (Emphasis added).

109.  One research study which expanded upon an MMWR study of mask wearing in schools and found different results stated "Certain journals may also only publish findings that fit their preference, as was the case with our analysis; our expanded version of the original Budzyn et al publication was not accepted for publication by MMWR

---

[38] Rosner E (2020) Adverse Effects of Prolonged Mask Use among Healthcare Professionals during COVID-19. J Infect Dis Epidemiol 6:130. doi.org/10.23937/2474-3658/1510130 or https://clinmedjournals.org/articles/jide/journal-of-infectious-diseases-and-epidemiology-jide-6-130.php?jid=jide (last viewed on September 18, 2022.)

despite using the same methods, but with an expanded population and time frame. This bias can lead to the published "science" being a self-fulfilling prophecy rather than an unbiased pursuit of truth." [39]

110.    Health authorities in the 1940s, on information and belief, recommended during the polio outbreak that children should stop eating ice cream since a researcher had found a correlation between eating sugar and contracting polio in a study titled *The production of neuronal injury and necrosis with the virus of poliomyelitis in rabbits during insulin hypoglycemia.*[40]

111.    The above study, posted on the NIH website, is now an example in statistics lessons showing that correlation does not imply causation; ice cream eating most likely increases in the summer and does not cause polio, but polio did spread more in the summer months.[41]

## THE CENTERS FOR DISEASE CONTROL

112.  The CDC's  published mask wearing guidance is not a law or regulation, nor does the CDC have such authority (*Florida v. Becerra*, 544 F. Supp. 3d 1241 (M.D. Fla. 2021).

113.  The court found mask mandates when using public conveyances exceeded CDC authority, as "Within the past two years, the CDC has found within § 264(a) the power to shut down the cruise ship industry, stop landlords from evicting tenants who have not

---

[39] Chandra, Ambarish and Høeg, Tracy Beth, Revisiting Pediatric COVID-19 Cases in Counties With and Without School Mask Requirements—United States, July 1—October 20 2021. Available at
SSRN: https://ssrn.com/abstract=4118566 or http://dx.doi.org/10.2139/ssrn.4118566 (last viewed October 16, 2022.)
[40] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1965163/  (last viewed November 3, 2022).
[41] https://datacadamia.com/statistics/correlation_does_not_imply_causation#eating_ice_cream (last viewed November 3, 2022).

paid their rent, and require that persons using public conveyances wear masks. Courts have concluded that the first two of these measures exceeded the CDC's statutory authority under § 264. (*Health Freedom Def. Fund v. Biden*, 8:21-cv-1693-KKM-AEP, at *9 (M.D. Fla. Apr. 18, 2022)).

114.  Courts acknowledge that CDC guidance is not law, but **administrative** guidance, "The Seventh Circuit has explained that 'CDC Guidelines-like other administrative guidance-do not themselves set a constitutional standard." *Mays v. Dart,* 974 F.3d 810, 823 (7th Cir. 2020). "[W]hile recommendations of these various groups may be instructive in certain cases, they simply do not establish the constitutional minima; rather, they establish goals recommended by the organization in question." *Id.*' (*Smith v. Monti*, 22-cv-435-DWD, at *6 (S.D. Ill. Mar. 21, 2022)).

115.  The CDC has a published study posted on its website (meta-analysis) with over 50 years of research studies analyzed indicating there was no statistically significant difference (or no benefit either way, in layman's terms) in wearing face masks.[42]

116.  Titles of the published research on display on the CDC page for face mask information[43] only include studies claiming masks work:

a) Time for universal masking and prevention of transmission of SARS-CoV-2. [44]

b) No Transmission of Symptomatic SARS-CoV-2 After Significant Exposure With Universal Face Mask Use at a Hair Salon.[45]

---

[42] Xiao, J., Shiu, E. Y., Gao, H., Wong, J. Y., Fong, M. W., Ryu, S., & Cowling, B. J. (2020). Nonpharmaceutical measures for pandemic influenza in nonhealthcare settings—personal protective and environmental measures. *Emerging infectious diseases, 26*(5), 967. Available at https://wwwnc.cdc.gov/eid/article/26/5/pdfs/19-0994.pdf (last viewed October 14, 2022).
[43] https://www.cdc.gov/media/releases/2020/p0714-americans-to-wear-masks.html  (last visited September 18, 2022).
[44] Brooks JT, Butler JC, Redfield RR. (2020). Time for universal masking and prevention of transmission of SARS-CoV-2. *JAMA.* doi:10.1001/jama.2020.13107 Available at
https://jamanetwork.com/journals/jama/fullarticle/10.1001/jama.2020.13107 (last viewed October 14, 2022).
[45] http://dx.doi.org/10.15585/mmwr.mm6928e2  (last visited October 5, 2022).

c) Factors Associated with Cloth Face Coverings Use during the COVID-19 Pandemic. [46]

117.  Bias is a concern in research, as explained in an article from the NIH website:

> Studies with positive results are greatly more represented in literature than studies with negative results, producing so-called publication bias. This review aims to discuss occurring problems around negative results and to emphasize the importance of reporting negative results. Underreporting of negative results introduces bias into meta-analysis, which consequently misinforms researchers, doctors and policymakers.... Therefore, **all stakeholders**, but especially researchers, **need to be conscious of disseminating negative and positive findings** alike.[47] (Emphasis added).

118.  One of the three examples the above article gives of a negative result is the danger of "Instead of desired outcome study produces the opposite effect entirely." *Id.*

119.  There was a time when neither branch of government attempted to choose a system or philosophy of medicine for the people, such as between allopathic and homeopathic. "'I do not think that it can be said that the laws of this State recognize any particular school or system of medicine as the legal or authorized school or system;' *White v. Carroll*, 42 N.Y. 161, 163-64 (N.Y. 1870)".

120.  Per author Tiedeman, in "A Treatise on the Limitations of Police Power in the United States", while referencing *White v. Carroll*,

---

[46] Fisher KA, Barile JP, Guerin RJ, et al. Factors Associated with Cloth Face Covering Use Among Adults During the COVID-19 Pandemic — United States, April and May 2020. MMWR Morb Mortal Wkly Rep 2020;69:933-937. DOI: http://dx.doi.org/10.15585/mmwr.mm6928e3  Available at https://www.cdc.gov/mmwr/volumes/69/wr/mm6928e3.htm?s_cid=mm6928e3_w  (last viewed October 14, 2022).
[47] Mlinarić A, Horvat M, Šupak Smolčić V. Dealing with the positive publication bias: Why you should really publish your negative results. Biochem Med (Zagreb). 2017 Oct 15;27(3):030201. doi: 10.11613/BM.2017.030201. PMID: 29180912; PMCID: PMC5696751. Available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5696751/  (last viewed September 22, 2022.)

> In the practice of medicine, an attempt has often been made by the old school of medicine, the school of allopathy, to bring homeopathy into legal disrepute and to deny to practitioners of that school equal privilege before the law; but the police power of the State can never be exercised in favor of or against any system of medicine. The police power can be brought to bear upon quacks, and disreputable practitioners, to whichever school they may belong, but when reputable and intelligent members of the profession differ in theories of practice, the State has no power to determine, which of them, if either, is wrong.[48]

121.  The CDC publicly stated its plan to collect data from schools on mask wearing and other Covid measures, along with school reported transmission rates. [49]

122.  The proposed title of the study is "National School COVID-19 Prevention Study" *Id*.

123.  This study indicates the CDC is conducting research upon minor subjects without parental consent, and encouraging public institutions to do the same.

124.  45 CFR 46, Protection of Human Subjects, discusses four times the ways in which the "rights and welfare of human subjects" or "rights and welfare of subjects" are to be safeguarded or protected.[50]

125.  One such location under 45 CFR 46 requires safeguards against **coercion**: "46.111 Criteria for IRB approval of research.... (b) When **some or all of the subjects** are likely to be vulnerable to **coercion or undue influence**, such as **children**, prisoners, individuals with impaired decision-making capacity, or **economically or educationally disadvantaged persons**, additional safeguards have been included in the study to protect the rights and welfare of these subjects." (Emphasis added)

---

[48] Tiedeman, Christopher G., *A Treatise on the Limitations of Police Power in the United States: Considered from Both a Civil and Criminal Standpoint*. 205 (1886).
[49] https://www.federalregister.gov/documents/2022/02/04/2022-02405/proposed-data-collection-submitted-for-public-comment-and-recommendations (last viewed October 16, 2022.)
[50] https://www.ecfr.gov/current/title-45/subtitle-A/subchapter-A/part-46  (last viewed October 4, 2022).

126. **Coercion is domestic terrorism** under 18 U.S. Code § 2331:   (5)"the term "domestic terrorism" means activities that—

(A)involve acts dangerous to human life that are a violation of the criminal laws of the United States or of any State;

(B)appear to be intended—

(i)to intimidate or **coerce a civilian population**;

(ii)to influence the policy of a government by intimidation or coercion; or

(iii)to affect the conduct of a government by mass destruction, assassination, or kidnapping; and

127.  People wishing to keep their jobs or visit a loved one in a hospital "are likely to be vulnerable to **coercion or undue influence"** when asked to wear a face mask.

128.  There has been a significant amount of research published on the use of masks for controlling virus spread; a search in Google Scholar will yield over 3,000 studies in 2022 alone.

129.  There is no doubt the multitude of research subjects and communities have been created upon the backs of the human subjects who were not allowed to provide informed consent.

**MENA REGIONAL HEALTH SYSTEM**

130.  The Mena Regional Health System website states it is "Following all updated CDC Guidance" and has "Extraordinary Infection Control Measures". (Exhibit B).

131.  The link to Covid 19 Information is a dead link and no longer available on the MRHS website. (Exhibit C).

132.  The wayback machine Internet archive[51] shows the page which used to be hosted on the MRHS website. (Exhibit D).

133.  The CDC's Covid 19 County Check was low as of September 15, 2022, for Polk County, Arkansas. (Exhibit E).

134.  The Plaintiff, along with an untold number of human subjects, to include children, pregnant women, fetuses, neonates, and prisoners, was coerced and deprived of the opportunity to provide informed consent to the use of a potentially harmful medical device.

## G. COUNT 1: SUBSTANTIVE DUE PROCESS—NO INFORMED CONSENT REQUIRED FOR DEVICES OR DRUGS THE DHHS SECRETARY DEEMS ARE MINIMAL RISK

### (Fifth and Fourteenth Amendments, U.S. Constitution; Article 2 § 21 Arkansas Constitution)

135.  All previous paragraphs are incorporated herein, by reference.

136.  The 2016 changes to 21 U.S.C. 360j(g)(3) and 21 U.S.C. 355(i)(4) are in violation of the liberty rights of Plaintiff guaranteed by the Fifth and Fourteenth Amendments of the United States Constitution.

## H. COUNT 2:  PRIVACY

### (Fourth Amendment to the U.S. Constitution and Article 2, § 15 of the Arkansas Constitution)

---

[51] https://web.archive.org/web/20211206052308/https://menaregional.com/covid-19-news-and-updates/ (last viewed November 28, 2022.

137.  All previous paragraphs are incorporated herein, by reference.

138.  Individuals have a right to privacy under both the Arkansas Constitution and the U.S. Constitution.

139.  The  "ARK. CONST. ART. 2,  § 15,  IS  VIRTUALLY identical to  the  Fourth Amendment to the United States Constitution, the supreme court interpreted article 2, section 15, in the same manner as the United States Supreme Court has interpreted the Fourth Amendment;" *(Mullinax v. State*, 327 Ark. 41, 42 (Ark. 1997))

140.  In this state, "Arkansas has recognized the existence of four actionable forms of invasion of privacy: (1) appropriation, which consists of the use of the plaintiff's name or likeness for the defendant's benefit; (2) intrusion, which is the invasion by one defendant upon the plaintiff's solitude or seclusion; (3) public disclosure of private facts, which is publicity of a highly objectionable kind, given to private information about the plaintiff, even though it is true and no action would lie for defamation; and (4) false light in the public eye, consisting of publicity that places the plaintiff in a false light before the public." (*Milam v. Bank of Cabot*, 327 Ark. 256, 257 (Ark. 1997)).

141.  Defendants appropriated Plaintiff's body temperature after she specifically asked the employee not to, and three employees attempted to coerce her to don an experimental face mask — in order to use for Defendants' own interests for research.

142.  Defendants intruded upon Plaintiff's right to not have her temperature taken by invading her personal space electronically to take her temperature after Plaintiff asked the employee not to do so.

143.  Plaintiff was not a patient but was visiting her daughter who just had a baby at the hospital.

144.  Due to the unreasonable and illogical guidance changes the CDC and government actors have engaged in since 2020, a reasonable person would read the research and determine for him or herself whether cloth face masks were effective, and then be highly objectionable to wearing one, especially in an environment staffed by medical personal who are well-versed in the use and efficacy of types of face masks.

145.  If face masks had an effect on the Covid-19 virus, why did the hospital deem it needed to take Plaintiff's  temperature?

146.  Some of the changes on mask wearing guidance include[52]:

a)    February 2020, The Surgeon General says wearing a face mask will not help the public.

b)    March 2020: The CDC states healthy people do not need to wear masks.

c)    April 2020: The CDC recommends masks due to reported asymptomatic spread.

d)    September 2020: The CDC recommends masks for students and teachers at school.

e)    January 2021: Biden signs multiple executive orders mandating masks, including stating it is a federal law to wear a mask on airlines and other transport.

f)    March 2021: The CDC releases guidance stating fully vaccinated individuals may relax their mask wearing.

g)    July 2021: The CDC states fully vaccinated individuals should return to mask wearing due to "break through cases".

---

[52] https://www.latimes.com/science/story/2021-07-27/timeline-cdc-mask-guidance-during-covid-19-pandemic (last viewed October 19, 2022).

## I. COUNT 3: PUBLIC ACCOMMODATION

### ( 42 U.S.C. § 2000a-1, Ark. Code § 16-123-107)

147.  All previous paragraphs are incorporated herein, by reference.

148. All persons shall be entitled to be free, at any establishment or place, from discrimination or segregation of any kind on the ground of race, color, religion, or national origin, if such discrimination or segregation is or purports to be required by any law, statute, ordinance, regulation, rule, or order of a State or any agency or political subdivision thereof. 42 U.S.C. § 2000a-1

149. "(a) The right of an otherwise qualified person to be free from discrimination because of race, religion, national origin, gender, or the presence of any sensory, mental, or physical disability is recognized as and declared to be a civil right. This right shall include, but not be limited to: (1) The right to obtain and hold employment without discrimination;(2) The right to the full enjoyment of any of the accommodations, advantages, facilities, or privileges of any place of public resort, accommodation, assemblage, or amusement; (Ark. Code § 16-123-107)"

150.  Defendants are practicing discrimination by not allowing the Plaintiff, who has the mental capacity and fortitude to not comply with an unconstitutional mandate, to enter the facility to visit a family member or to obtain future treatment for herself or a family member.

151. The Defendants owe Plaintiff a duty to provide legal, reasonable, and adequate medical care within the community; defendants breached their duties and failed to operate as a reasonably prudent medical facility should (*Lukes v. Dept. of Public Welfare*, No. 15 C.D. 2008 (Pa. Cmmw. Ct. June 3, 2009)).

152.  Defendants called the city police to come to the hospital when Plaintiff would not wear a mask.

153.  Defendants did not allow Plaintiff to visit her newborn grandson and daughter after Plaintiff declined to put on the experimental medical device.

## J. COUNT 4: SUBSTANTIVE DUE PROCESS.

(Violation of 42 U.S.C. §1983; Fifth and Fourteenth Amendments, U.S. Constitution;

Article 2 § 21 Arkansas Constitution)

154.  All previous paragraphs are incorporated herein, by reference.

155.  Defendants, under color of law, implemented a mask mandate for visitors, stating CDC guidance, which violating Plantiff's substantive due process rights under the Fifth and Fourteenth Amendments of the Constitution of the United States, and a violation of "Banishment prohibited" under Article 2 § 21 of the Arkansas Constitution.

156.  Mask wearing is not related to any proper government objective, just as with segregation: "Although the Court has not assumed to define "liberty" with any great precision, that term is not confined to mere freedom from bodily restraint. Liberty under law extends to the full range of conduct which the individual is free to pursue, and it cannot be restricted except for a proper governmental objective." (*Bolling v. Sharpe*, 347 U.S. 497, 499-500 (1954)).

157.  Mask wearing imposes yet another type of segregation upon the American people: those who obey without questioning, those who want to keep their jobs, those who want their kids to attend public schools, those who are fearful and seeking comfort, and those who are willing to research the topic or already know the facts.

158. Plaintiff has the constitutionally protected right to breathe unimpeded and unencumbered by scientifically demonstrated harmful coverings showing repeatedly to have no statistically significant difference on an airborne virus, influenza, or Covid 19.

> Generally, liberty interests protected by the Fifth Amendment are considered under one of two standards: strict scrutiny and rational-basis review. If a right is fundamental, strict scrutiny applies. *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997). To survive strict scrutiny, a governmental restriction of a fundamental right must be "narrowly tailored to serve a compelling state interest." *Id.* at 721 (quoting *Reno v. Flores*, 507 U.S. 292, 302 (1993)). If a right is not fundamental, then rational review is applied, and the restriction at issue survives as long as it is "rationally related to a legitimate government interest." *Reyes v. N. Tex. Tollway Auth.*, 861 F.3d 558, 561 (5th Cir. 2017).
>
> In turn, to decide if the implicated right is fundamental, that right must be "carefully describe[d]." *Malagon de Fuentes v. Gonzales*, 462 F.3d 498, 505 (5th Cir. 2006). In the instant case, the district court correctly defined the right as "the right to international travel." We next consider whether that right is "'deeply rooted in this Nation's history and tradition' . . . and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if [the right was] sacrificed.'" *Glucksberg*, 521 U.S. at 721 (first quoting *Moore v. City of E. Cleveland*, 431 U.S. 494, 503 (1977), then quoting *Palko v. Connecticut*, 302 U.S. 319, 325, 326 (1937)). The Supreme Court has cautioned that, because declaring a right as fundamental "to a great extent . . . place[s] the matter outside the arena of public debate and legislative action," courts should "exercise the utmost care whenever [they] are asked to break new ground in this field." *Id.* at 720 (quoting *Collins*, 503 U.S. at 125). (*Franklin v. United States*, No. 21-11104, at \*6-7 (5th Cir. Sep. 15, 2022))

## K. COUNT 5:  EQUAL PROTECTION

159.  All previous paragraphs are incorporated herein, by reference.

160.  Mena Regional Health System's mask mandate described above, to the extent it subjects Plaintiff to more burdensome requirements than similarly situated providers of medical services, with no corresponding benefit, medical or otherwise, arbitrarily and

irrationally deprives Plaintiff of her rights to equal protection guaranteed by the Fourteenth Amendment of the United States Constitution.

## L. COUNT 6: INFORMED CONSENT (MEDICAL NEGLIGENCE)

161.  All previous paragraphs are incorporated herein, by reference.

162.  Using coercion, Defendants attempted to force an experimental use medical device on Plaintiff, a visitor to the hospital, without informed consent.

163.  Defendants directed this attempt through employees in administrative positions who were not authorized to practice medicine without a license.

164.  Even in an emergency, informed consent is required when the individual is able to provide consent.

165.  Defendants' employees took Plaintiff's temperature after Plaintiff informed the employee she did not consent to having her temperature taken (battery).

166.  Plaintiff was capable at all times of providing or declining consent.

167.  "As defense counsel explained, under Cobbs, "lack of informed consent is medical negligence. Lack of consent, period, is a battery in the medical context. " *Saxena v. Goffney*, 159 Cal.App.4th 316, 328 (Cal. Ct. App. 2008)

168.  The Courts have been critical in ensuring citizens, in both medical and research situations, have the right to both consent and informed consent. "In the early twentieth century, the behavior of physicians was often egregious, and courts did not shrink from using ringing language and sweeping principles to denounce it. The same language was then applied as precedent in later cases in which physicians' behavior was less outrageous. As the informed-consent doctrine developed and problems grew more subtle,

the law could have turned away from the language of self-determination but instead increasingly relied on this rationale as its fundamental premise. The language in the early cases suggests that rights of freedom from bodily invasion contain rights of medical decision making by patients." [53]

169.  "During the 1950s and 1960s, the traditional duty to obtain consent evolved into a new, explicit duty to disclose certain types of information and then to obtain consent. This development needed a new term; and so informed was added onto consent, creating the expression informed consent, in the landmark decision in *Salgo v. Leland Stanford, Jr. University Board of Trustees* (1957). *Id.*

170.  Research and Medicine both had court influence to arrive at current standards of self-determination, autonomy, consent, and informed consent. Gone are the days when doctors would intentionally lie to their patients under the guise of sparing the details to speed healing, for example. *Id.*

171.  "Anglo-American law starts with the premise of thoroughgoing self-determination, each man considered to be his own master. This law does not permit a physician to substitute his judgment for that of the patient by any form of artifice. The doctrine of informed consent arises out of this premise." *Scott v. Bradfor*d, 606 P.2d 554, 556 (Okla. 1980)"

172.  Hospitals receiving federal funds owe a duty to not discriminate, such as when a medical device is rejected (42 U.S. Code § 2000d, 42 U.S. Code § 6102, 29 U.S. Code § 794).

---

[53] https://www.encyclopedia.com/science/encyclopedias-almanacs-transcripts-and-maps/informed-consent-i-history-informed-consent (last viewed October 23, 2022).

173.  "After *Quinlan*, however, most courts have based a right to refuse treatment either solely on the common law right to informed consent or on both the common law right and a constitutional privacy right. See L. Tribe, American Constitutional Law § 15-11, p. 1365 (2d ed. 1988)." *Cruzan ex rel. Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261, 271 (1990)"

174.  The Defendants owe Plaintiff a duty to provide legal, reasonable, and adequate medical care within the community.

175.  Defendants breached their duties and failed to operate as a reasonably prudent medical facility should.

176.  Defendants attempted to coerce Plaintiff into donning a medical device authorized for experimental use.

177.  Defendants did not inform Plaintiff of the multiple risks associated with donning a medical device authorized for experimental use.

178.  Defendants called the city police to come to the hospital when Plaintiff would not wear a mask.

179.  Defendants did not allow Plaintiff to visit her newborn grandson and daughter after Plaintiff declined to put on the experimental medical device.


## M. PRAYER FOR RELIEF

"He assigned judges to each of the fortified cities in Judah and told them:

'Be careful when you make your decisions in court, because you are judging by the Lord's standards and not by human standards, and he will know what you decide.  So do

39

your work in honor of him and know that he won't allow you to be unfair to anyone or to take bribes.' " 2 Chronicles 19:5-7 (CEV)

180.  Wherefore, Plaintiffs respectfully request that this Court:

a.  Issue a declaratory judgment that Mena Regional Health System mask mandate is unconstitutional under the liberty clause of the Fourteenth Amendment to the United States Constitution and in violation of 42 U.S.C. § 1983;

b.  Issue a declaratory judgment that 21 U.S.C. 360j(g)(3) (devices), as well as  21 U.S.C. 355(i)(4) drugs are unconstitutional under the liberty clause of the Fourteenth Amendment to the United States Constitution;

c.  Issue preliminary and permanent injunctive relief restraining Defendants, their employees, agents, and successors from enforcing a Mena Regional Health System mask mandate or temperature taking, or other medical devices or treatments, upon visitors or patients without factual informed consent and consent;

d.  Issue an order prohibiting Defendants, their employees, agents, and successors from bringing enforcement actions against visitors or patients not consenting to masks or temperature taking while a Preliminary Injunction is in effect;

e.  Issue a declaratory judgment that the Mask mandate and temperature taking without informed consent are unconstitutional as applied and enforced by Defendants, under the due process and equal protection clauses of the Fourteenth Amendment to the United States Constitution and in violation of 42 U.S.C. § 1983;

f.  Award Plaintiff filing fees, or any other reasonable costs incurred pursuant to 42 U.S.C. § 1988; and

g.  Grant such other or further relief as the Court deems just, proper, and equitable.

RESPECTFULLY SUBMITTED this 29th day of November 2022.


_/s/ Alana S. Phillips_

Alana S. Phillips
3461 Highway 8 E
Mena, Arkansas 71953
940 437 0049
phillipsar@yahoo.com

_Pro Se Plaintiff_